# Wheeling.

## Simon B. Williams, &c., *et al. vs.* Alexis M. Buster, *et al.*, Administrators.

### July Term, 1872.

1. When a vendor has contracted to give full and peaceable possession, and seeks to enforce his lien by bill, and it is answered that part of the land is, and has been, in actual adverse possession as against the vendee, and the cause is heard on the bill and answer, it is error to decree in favor of the vendor without first inquiring into the question of title, &c., and ascertaining what abatement of the purchase money, if any, ought to be made.

2. It is held that administrators who qualified in Greenbrier county in 1863, under the Confederate government, ought not to be charged with the value of a negro slave, because of the difficulty of making sale of such slave, or of getting anything but Confederate money in payment; and because if they had retained the slave until there was another currency in the country, such slave would have died in their hands; especially as it does not appear that they intermeddled with, or realized anything from the slave.

3. B. sold to W. and S. and S. certain real estate in Greenbrier county. A part of the purchase money remained unpaid at the death of W. and at the date of the administration in 1863, in that county, which was then under the authority of the Confederate government. Prior to the death of W. the real estate had been sold by him and S. and S. to the Allegheny College, an incorporated institution which was insolvent at the date of this suit, and which had no assets except what it was entitled to out of this property. In 1864 the administrators, or executors *de son tort*, surrendered to the college its bonds executed in payment of the property to their intestate, upon receiving the amount thereof in Confederate money. In a suit by the *legal* administrators of B. appointed in 1866, to enforce the vendor's lien, the court below decreed that the administrators or executors *de son tort*, should pay the balance of the lien by reason of having received payment from the Allegheny College. Held:

   I. That the administrators, or executors *de son tort*, of W., should only be chargeable, if at all, with the cash value of the Confederate money so received by them. But inasmuch as this Confederate money was paid over to the distributees of W., or invested for their benefit, the administrators should not be charged with anything by the creditors, on account of the receipt of this money, until the other estate of W. is first exhausted; and they should have a credit in their settlement with the distributees with such amounts as they so paid them, and should be charged, as against such of them or the creditors, with the actual cash value of the residue of the Confederate money, if any, so received and unaccounted for by them.

II. It appearing that S. and S. were joint owners with W. at the time of the sale to the Allegheny College, and were jointly liable for the residue of the purchase money due B's estate, an account ought to be directed to settle the respective proportions thereof, and to fully settle the estate of W.

The bill in this cause was filed at February rules, 1868, in the circuit court of Greenbrier county. The decree complained of was rendered December 31, 1869.

The defendants, Williams, brought the cause here for review.

See opinion of the court for statement of facts.

*Mathews & Mathews* for appellants.
*Dennis* and *Price & Sperry* for appellees.

BERKSHIRE, P.   George W. Buster sold to John Williams, Joseph H. Snead and Charles Stebbins, the Blue Sulphur Springs property, in August, 1858, for twenty-two thousand dollars, to be paid in three equal payments.   After the first payment had been made, namely, in February, 1859, he made them a deed for the property, retaining a lien for the residue of the purchase money.   Buster having afterwards died, Alexis M. and Ann E. Buster, qualified as administrator and administratrix on his estate, and have instituted this suit to enforce the vendor's lien and recover the residue of said purchase money, against Simon B. and Thomas M. Buster, as late executors or administrators *de son tort* (they having qualified as administrators under Confederate authority, in Greenbrier county, in 1863,) and Albert G. and George W. Williams, who qualified as the *legal* administrators of John Williams, in 1866, and others.

It is alleged in the bill that John Williams had died, and that Simon B. and Thomas M. Williams qualified as administrators, and took possession of the principal portion of his personal estate, in 1863, and proceeded to administer the same, converting the most of it, however, to their own use. That Albert G. and George W. Williams qualified as administrators in 1866, and took the residue of the personal estate of John Williams into their posession and disposed of the same; and that, at the time of his death, he had a large es-

344 . COURT OF APPEALS OF WEST VIRGINIA.

July Term, Williams, &c et. al. vs. Buster et al., Adm'rs. 1872

tate, real and personal, ample to .meet his liabilities and that there was still a large real estate in Greenbrier county, belonging to said estate. It is also alleged that John Williams in his life time, and the said Snead and Stebbins had sold the "Blue Sulphur Springs tract," to the Allegheny College. But upon what terms the complainants did not know.

None of the defendants answered the bill, except Charles and Lucy Buster, being two of the heirs of George W. Buster, deceased, (Alexis M. Buster being the remaining heir,) who state that they are willing that all of the property mentioned in the bill, may be sold, and the proceeds of sale divided according to the terms of the contract between their father George W. Buster, and the said John Williams, and Snead and Stebbins.

The cause was referred to a master to settle the accounts of the two sets of administrators of John Williams, and also to ascertain the amount of purchase money still due the estate of George W. Buster, from the estate of John Williams and Snead and Stebbins, for the "Blue Sulpur Springs property."

Subsequently the master filed his report in which the residue of said purchase money was ascertained to be eleven thousand nine hundred and sixty-one dollars and sixty cents as of the 12th June, 1869. The indebtedness of the administrators *de son tort* to be two thousand five hundred and seventy dollars and sixty cents and one thousand eight hundred dollars of which was the amount of a bond due to the estate from one Allen, which bond they had transferred to the widow of their intestate, and would be entitled to a credit in any settlement with her, though not as against the *creditors* of the estate. And the indebtedness of the last administrators is found to be four thousand nine hundred and three dollars and eleven cents, also of the 12th of June, 1869.

The master also reports, that John Williams, at his death, owned a negro woman valued or appraised at eight hundred dollars, which amount he did not charge against the first administrators; because of the difficulty in making sale of her, or of getting anything but Confederate money ; and because if they had retained her until there was *another* currency in the country she would have died on their hands.

He further reports that these administrators received in

1864 from the Allegheny College thirty-four thousand five hundred dollars in Confederate currency, being part of the purchase money for the Blue Sulphur Springs property sold to it, by John Williams, Snead and Stebbins; and thereupon surrendered up to the college its bonds, executed for the purchase money for said property, then amounting to forty-two thousand five hundred and sixty-one dollars. The sum so received, however, is not charged against the administrators, for several reasons assigned by the master; the *principal* one being that, as the Allegheny College was an insolvent corporation without any property whatever, except the real estate upon which the complainant's and other debts, were a lien, which could been enforced against it, the bonds so surrendered, if they had been retained would have been utterly worthless and unavailing both to creditors and distributees of John Williams; and also for the reason that the said administrators had distributed and vested this money, among and for the benefit of said distributees who made no objection on that account.

No exceptions were taken to this report, and so far as appears, no objections were urged against it by the creditors or distributees or other parties interested in the premises.

When the report was considered by the court, however, the views of the master, in respect to the amount of the Confederate currency so received from the Allegheny College, and also as to the negro woman, were overruled and a decree rendered charging the administrators *de son tort* with the whole amount of the bonds due from said college, then amounting to some fifty-seven thousand three hundred dollars; and decreeing that the debts due from the estate of their intestate, should first be paid by them out of the amount due from them as administrators in their own wrong; after which they were to have a credit, as against the distributees, for all sums received voluntarily by such of them as were of age, whether paid in good money, or Confederate currency. And it was accordingly decreed that the complainants do recover against the administrators *de son tort*, and Snead and Stebbins and also against the rightful administrator, the sum of eleven thousand nine hundred and sixty-one dollars and sixty cents the residue of the purchase money for the Blue Sulphur

44

Springs property. A decree was also rendered against the wrongful administrators, in favor of William T. Mann for three thousand dollars, with interest, it being for purchase money for real estate consisting of two tracts of land, which Mann had sold to John Williams in his life-time, and for the recovery of which he had instituted his suit in equity, asking to enforce the vendor's lien; and also a decree against the same parties in favor of Ellett and Drewry for two hundred and nine dollars and twelve cents with interest, for the recovery of which they had also instituted a suit in equity—all three of the causes being heard together.

It is of this decree that complaint is now made. The principal objections urged against the decree are three.

I will first consider those of the lesser importance. One of them was for decreeing to Mann the whole amount of purchase money claimed by him, upon the case, as made by the pleadings. This case was heard on the bill, and exhibits, and answer.

It appears from the deed from Mann to John Williams, for the land now in question, which is filed as part of the bill, that the former was to put the latter in full and peaceable *possession* of each of the tracts so conveyed; and the bill alleges that the complainant had conveyed the land according to his contract, but received no part of the purchase money, &c. The answer of A. G. and G. W. Williams, the legal representatives of John Williams, is filed, in which it is denied that the complainant had complied with the contract and undertaking, by giving full and peaceable possession of the land so conveyed, and it is averred that as to a part of one of the tracts, actual adverse possession of it had been held against John Williams, and his heirs ever since his purchase and the conveyance of Mann.

The court erred therefore in decreeing in favor of said Mann, without first enquiring into the question of title, &c., and ascertaining what abatement of the purchase money, if any, ought to have been made.

The next objection to be noticed is, the action of the court in charging the first administrators with the negro woman, or the appraised value of her. Under the peculiar circumstances which surrounded them, I think it would be unrea-

sonable to charge them with anything on her account, especially as it does not appear that they ever intermeddled with, or realized anything from her.

The remaining and most important objection to be considered, is the charging of the last named administrators with the amount of the Allegheny College bonds, surrendered by them upon the receipt of the thirty-four thousand five hundred dollars in Confederate currency.

In the consideration of this question it is material to enquire first, with what amount if any on this account are they, under the circumstances, properly chargeable? It was reported by the master, and it has not been controverted here, that the Allegheny College was a corporation, and was wholly insolvent—its only property then being the real estate conveyed to it by John Williams, Snead and Stebbins, which is still liable for the purchase money, still due to the estate of George W. Buster deceased; and that if its bonds so surrendered, by the wrongful administrators, had not been collected or surrendered, they would be of no avail either to the creditors or heirs of John Williams. I think, therefore, the said administrators, if chargeable at all, should only be with the *cash* value of the Confederate currency received by them, at the time it was so received.

But as it is alleged that this currency, or a large portion of it, was paid over to the distributees of John Williams, and invested for their use, these administrators should not be charged with anything by the creditors, on account of the receipt of the money, until the other estate of said Williams is first exhausted; and should have a credit in any settlement with the distributees for any amount so received by them, or such of them as were of age; and should be charged as against such of them, or the creditors, with the *actual* or cash value of the residue of the currency, if any, so received and unaccounted for.

And as it appears, that the Blue Sulphur Springs property belonged jointly to John Williams, Snead and Stebbins, when it was sold to Allegheny College, the purchase money so received by the wrongful administrators of Williams would seem also to belong to them jointly. And as they were jointly liable for the residue of the purchese money, due

the estate of George W. Buster for said property, and it does not appear what portion of the same has been paid or is due from, or ought to be paid by them respectively, an account ought to be ordered to ascertain such matters, unless they can be agreed by the parties; and also to settle fully the estate of John Williams, both as to the creditors and distributees.

The decree should be reversed with costs, and the cause remanded for further proceedings.

The other judges concurred.

DECREE REVERSED.